UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

                                                 **24 Cr. 219 (PMH)**

      -v-

NIHEEME ANDERSON

_____X

MOTION TO SUPPRESS EVIDENCE

Federal Defenders of New York, Inc
52 Duane Street
New York, New York 10007

Mark B. Gombiner
Of Counsel

To: DAMIAN WHITE, ESQ.
     United States Attorney
     Southern District of New York
     One St. Andrews Plaza
     New York, New York 10007
     Att'n Kingdar Prussien
         Assistant United States Attorney

1

## PRELIMINARY STATEMENT

Pursuant to Rule 12(b)(3) ( C ) of the Federal Rules of Criminal Procedure, Niheeme Anderson moves to suppress evidence seized from his person following his warrantless arrest on December 6, 2023.   Mr. Anderson also moves to suppress, as fruits of the poisonous tree, subsequent statements made to law enforcement authorities on December 6, 2023 and evidence seized from his apartment on December 7, 2023.

The motion should be granted because on December 6, 2023, New York State Trooper Dale Beckmann handcuffed and immediately searched Mr. Anderson after Trooper Beckmann touched Mr. Anderson's coat and felt an unidentified package that he knew was not a gun or dangerous weapon. Trooper Beckmann's actions violated Mr. Anderson's Fourth Amendment rights and require that the contraband seized from Mr. Anderson and the direct fruits of the seizure be suppressed.

## STATEMENT OF FACTS

### A Tip from a Confidential Informant.

This case began with a tip about a proposed gun sale.

In late November of 2023 a confidential informant contacted Brian Pasquale, an investigator for the New York State Police.1*Affidavit of Brian Pasquale,* **Exhibit A.**   The informant told Pasquale that someone named "Mike" had a ghost gun that he was looking to sell. **Id., par. 7.**    The informant subsequently provided Investigator Pasquale with pictures of the gun and Mike's telephone number. **Id., par. 8.**

---

1 Investigator Pasquale's Affidavit asserts that the informant had been used in prior investigations and was reliable. **Exhibit A, par. 6.**

On December 3, 2023, the police attempted to conduct an undercover purchase of the gun from "Mike." However, when the CI called Mike, he did not answer. At this point, the CI called someone he identified only as "Light," The CI asked "Light" if he had spoken to Mike and "Light" responded "I just seen him and copped that." Investigator Pasquale does not claim that the CI provided any other identifying information about "Light" and/or a physical description. **Exhibit A, par. 9.**

On December 5, the CI called Investigator Pasquale again and told him that that "Light" was planning to make a trip the following day from Poughkeepsie to New York City to "pick up a resupply of narcotics." **Exhibit A, par. 10.** The CI said that "Light" would be traveling ins a 2013 red Dodge Durango and supplied the vehicle's license plate number.

The next day Investigator Pasquale contacted New York State Police Troop K and told them about the tip. Troop K New York State Trooper Dale Beckmann recorded that on December 6, 2023 he "received information from SIU-Hudson Valley that NY Reg. JCV3950 was making a trip to New York City to possibly purchase narcotics…and that "the unknown male is known to carry a firearm." **Report of Trooper Dale Beckmann, Exhibit B**

**The Stop of the Durango**

At around 5:00 PM on December 6, New York State Troopers Dale Beckmann and Sean Rohde were parked on the center median of the Taconic State Parkway near the intersection of Interstate 84 with their vehicle facing south. The troopers observed a red Dodge Durango heading north and claimed to see that the car had "dark window tinting and an obscured front license plate.". Trooper Beckman followed the vehicle and confirmed the Durango's New York license plate matched the number of the vehicle they were looking for. As he followed the

Durango, Trooper Beckmann claims that he saw the car drifting over the white dotted lines, following other cars too closely, and supposedly "accelerating while the driver had the brake pedal pressed."[2]     When the Durango reached East Fishkill, New York, the troopers ordered the car to pull over.   A woman was driving the car and a man was seated in the front passenger seat

**Initial Questioning**

The subsequent interactions between the occupants of the vehicle and Trooper Beckmann are recorded on his body camera beginning at 5:08 p.m.   The body camera footage will be separately provided as **Exhibit C.**

Trooper Beckmann approached the driver's side of the car from behind and informed both the driver and passenger that they had been pulled over for going too fast and because of supposedly tinted windows. The driver handed over her license and registration immediately which identified her as Stacy Paulin.   Ms. Paulin, cooperated with all of Trooper Beckmann's requests, began searching her phone for her car insurance. Trooper Beckmann asked Ms. Paulin to exit the car. She obliged. Ms. Paulin informed Trooper Beckmann that she was driving home to Poughkeepsie from New York and that they were in New York for approximately four hours. She answered all of Trooper Beckmann's questions in a cordial manner.

A few minutes later, at about 17:13:30, Trooper Beckmann moved to the passenger side to interview the passenger (Niheeme Anderson). The passenger told him he was headed to Poughkeepsie and coming back from the Bronx. Mr. Anderson engaged Trooper Beckmann in a conversation about Christmas shopping and recommended a great sale on presents in

---

[2]Trooper Beckham does not explain how the driver accomplished this feat.

Connecticut. In response to a question from Trooper Beckmann, he told him his name was "Niheeme."

Following his initial questioning of Mr. Anderson, Trooper Beckmann returned to Ms. Paulin and repeatedly asked her whether there was anything illegal in the car or on her person. She unequivocally denied there was any contraband in the car. Trooper Beckham asked her for consent to search the car for drugs, explaining that there were some discrepancies between what she and Mr. Anderson had told him. She readily agreed, assuring him that there was nothing illegal to be found. **Exhibit C, 17:17:35.**

**Two Terry Frisks**

Having secured consent to search the car, Trooper Beckmann returned to the passenger side of the Durango and instructed Mr. Anderson to "just hop out for one second." **Exhibit C, 17:18:45.** Before Mr. Anderson got out of the car, Trooper Beckmann twice told Mr. Anderson that he was not under arrest and that he was likely to be on his way in a few minutes. **Exhibit C, 17:18:48; 17:18:58.**

Mr. Anderson cooperated and got out of the car. As soon as he left the car, Trooper Beckham told him that "just cause you got out of the car, I'm going to pat you down, got any weapons?" Mr. Anderson turned around to face the car and lifted his waist length jacket to show the trooper that there was nothing under the coat. In a further effort to cooperate, Mr. Anderson briefly raised his hands in the air. Trooper Beckmann informed that wasn't "necessary" and the conducted a brief pat-down search.

Following the frisk, Mr. Anderson took a step towards the car.   Trooper Beckmann asked him to "come here."   The trooper informed Mr. Anderson that "as police, when we stop people, we talk to people."   **Exhibit C, 17:19:41.**

Mr. Anderson listened, with a pack of cigarettes in his hand.   Trooper Beckmann asked him about the cigarettes and Mr. Anderson put both his hands in the open pockets of his coat. Trooper Beckmann responded by telling Mr. Anderson that "I'm just going to pat your pockets again."

Mr. Anderson took his cellphone out of his right pocket and assured Trooper Beckmann that there was nothing else in his open pockets.   Trooper Beckmann then appears to have observed a lump or bulge in the top left portio of Mr. Anderson's jacket.   He asked Mr. Anderson "what's that" and Mr. Anderson answered "Oh, that's just a package for my brother."

**Exhibit C, 17:19:58.**

**Illegal Seizure and Search**

Without further inquiry, Trooper Beckmann lightly touched the top left part of Mr. Anderson's coat and asked "what is it?"   **Exhibit C, 17:20:00.**   As soon as he touched the coat, Trooper Beckmann directed Mr. Anderson to "put your hands behind your back for a second."

**Exhibit C, 17:20:06.**

Trooper Beckmann does not claim that he thought the object he touched was either a weapon or contraband.   In his report, Trooper Beckmann acknowledges that he only felt "a large, bulky item in his front left jacket pocket."   The criminal complaint confirms that Trooper Beckmann's only felt a "large bulky item in Anderson's front left jacket pocket."   *Federal Criminal Complaint, 24 Mag 872, par. 13 f.*   Mr. Anderson's *Affirmation,* **Exhibt D, par. 10,**

6

states that the bag he had in his front left jacket pocket was "in my zipped pocket and was not visible."

After directing Mr. Anderson to put his hands behind his back, Trooper Beckmann immediately grabbed Mr. Anderson and started to handcuff him.   Mr. Anderson briefly resisted, but after a very short struggle, Trooper Beckmann, aided by other troopers, handcuffed Mr. Anderson and slammed him face down on the ground. **Exhibt C, 17:20:32**.

A few seconds later, police officers turned Mr. Anderson over.   One of the troopers unzipped the interior left pocket of Mr. Anderson's coat and removed a plastic bag of what turned out to be 400 grams of powdered cocaine.

**Incriminatory Statements and Additional Contraband Obtained as A Result of the Illegal Seizure and Search.**

**Incriminatory Statements.**

Mr. Anderson was taken to Poughkeepsie for further questioning. In the interrogation, He made incriminating statements, admitting the cocaine seized from his pocket was his and that he had recently purchased a ghost gun from someone named Mike.   Mr. Anderson further told the polce that the "gun was currently in an apartment that he ownership over and a key to access." Mr. Anderson further told the police that there were both drugs and other guns in his apartment. **Exhibit A, par. 12.**

**Drugs and Guns Seized from Mr. Anderson's apartment.**

On December 7, 2023,, the Honorable Edward A. Gabel, a Town of Poughkeepise Court Judge, issued a search warrant for Mr. Anderson's residence at 12 Rhobella Drive in Poughkeepsie. **Exhibit A.**   As probable cause for the issuance of the warrant. Judge Gabel relied

on the Affidavit of New York State Investigator Brian Pasquale. The evidence for probable cause cited by Investigator Pasquale is derived almost exclusively from the search and seizure of Mr. Anderson and the incriminatory statements he made following the illegal arrest. **Exhibit A, pars. 11-12.**

The police executed the warrant on December 7, 2023.   They recovered a substantial amount of contraband, including three handguns and more than one hundred grams of cocaine base.   *Criminal Complaint,* pars. 14 and 15.

## ARGUMENT

### TROOPER BECKMANN DID NOT HAVE PROBABLE CAUSE TO FORCIBLY SEIZE AND SEARCH MR. ANDERSON BASED ONLY ON FEELING AN UNIDENTIFIED OBJECT THAT THE TROOPER KNEW WAS NOT A WEAPON AND THAT WAS NOT IMMEDIATELY APPARENT AS CONTRABAND

Trooper Beckmann did not have probable cause to forcibly seize and search Mr. Anderson when he simply felt a "large, bulky item" in Mr. Anderson's zipped front left jacket pocket while conducting a *Terry* frisk. The subsequent warrantless search and seizure violated Mr. Anderson's Fourth Amendment rights and requires the suppression of the cocaine the police retrieved from Mr. Anderson after he was handcuffed.   *Minnesotat v. Dickerson*, 508 U.S. 366 (1993); *Terry v. Ohio*, 392 U.S. 1, 1968.   The incriminatory statements made by Mr. Anderson following his illegal arrest and the contraband seized from Mr. Anderson's apartment must also be suppressed as the fruit of the poisonous tree.   *Wong Sun v. United States*, 371 U.S. 471 (1963).

The warrantless search of a person is "*per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions."   *Mincey v.*

8

*Arizona*, 437 U.S. 385, 390 (1978).   A limited search for weapons, without a warrant and without probable cause, is also permissible in connection with a lawful custodial interrogation tht does not rise to the level of an arrest. *Terry v. Ohio,* 392 U.S. 1, 21 (1963); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (when a police officer makes a reasonable investigatory stop, he is entitled to conduct a limited protective search for concealed weapons if he also has a reasonable belief that the person he is questioning is armed and dangerous). A protective search for weapons, however, must be strictly limited to this purpose and does not authorize a generalized "cursory search."   *Adams v. Williams* at 146; *Ybarra v. Illinois*, 444 U.S. 85, 93-94 (1979).

Trooper Beckmann far exceeded the permissible bounds of *Terry* when he handcuffed and forcibly searched Mr. Anderson immediately after touching Mr. Anderson's jacket and feeling what he described as a "large, bulky" item.   The facts of this case are extremely analogous to the circumstances in *Minnesota v. Dickerson* which the Court found violated the Fourth Amendment.

In *Dickerson,* a police officer conducted a pat-down search of a person he suspected of drug possession.   Although the search revealed no weapons, the officer felt a small lump in the defendant's jacket pocket.   After manipulating the object, the officer believed it to be a lump of crack cocaine and then reached into the pocket and retrieved a small bag of cocaine. The Supreme Court concluded that this warrantless search violated the Fourth Amendment because although the officer was "entitled to place his hands upon respondent's jacket….the incriminatory character of the object was not immediately apparent to him." *Dickerson* at 378.

Trooper Beckmann's actions are even more violative of the Fourth Amendment than

9

those of the officer in *Dickerson*. Trooper Beckmann went beyond manipulating the object—instead he immediately handcuffed and forcibly searched Mr. Anderson even though the only thing he knew about the object was that it was *not* a weapon. Nor, does Trooper Beckmann contend that the concealed item was "immediately apparent" as contraband.   To the contrary, he had just been told by Mr. Anderson that it was a "package for my brother."

There was nothing else about the encounter that would have authorized Trooper Beckmann to handcuff and search Mr. Anderson.   Prior to the handcuffing, Mr. Anderson had been calm, cordial, and courteous.   He had remained seated in the car when the trooper spoke to Ms. Paulin; he got out of the car when Trooper Beckmann told him to do so, he cooperated with wtith the initial Terry frisk.   He was calm and cordial during all of these interactions.

The only other information Trooper Beckmann had about Mr. Anderson was that he was a passenger in a vehicle that was suspected of "making a trip to New York City to possibly purchase narcotics" and that "the unknown male is known to carry a firearm"   Trooper Beckmann knew nothing else about the "unknown male," including his name, age, race, height or weight.   Nor, other than the vague tip about the vehicle "possibly" traveling to New York City to purchase narcotics did Trooper Beckmann have any other reason to believe that Mr. Anderson had committed a crime or was armed and dangerous.

In sum, Trooper Beckmann, at most, was entitled to conduct a limited pat-down search of Mr. Anderson to determine if he was carrying any weapons.   But, he had not authority to handcuff and forcibly search Mr. Anderson merely because he felt a "large, bulky item" in Mr. Anderson's jacket which he knew was not a weapon and which was not immediately apparent as contraband.   Accordingly, the cocaine seized from Mr. Anderson must be suppressed. *United*

*States v. Casado*, 309 F.3d. 440 (2d Cir. 2002)(evidence had to be suppressed where police searched defendant's pocket without first conducting pat-down to determine if defendant was carrying a weapon).

Mr. Anderson's subsequent in-custody statements to the police and the contraband found in his apartment after the police obtained a search warrant must also be suppressed. Both the statements and the contraband discovered in his apartment are the direct fruits of the illegal search and seizure. *Wong Sun v. United States*, 371 U.S. 471 (1963); *United States v. Traska*, 111 F.3d 1019, 1026 (2d Cir. 1997)(search warrant may not be supported by evidence from n illegal search).

## CONCLUSION

For the foregoing reasons, all evidence seized by the police from Mr. Anderson on December 6, 2023 and December 7, 2023 and statements made by him on December 6, 2023 should be suppressed. In the alternative, the Court should conduct an evidentiary hearing on the matters raised by this motion to suppress.

Respectfully submitted,

Mark B. Gombiner
Attorney for Niheeme Andersoncc:

A.U.S.A. Kingdar Prussien

11

12