UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                                                              **OPINION AND ORDER**

NIHEEME ANDERSON,                                                          7:24-cr-00219 (PMH)

                       Defendant.
-----------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

      Niheeme Anderson ("Mr. Anderson" or "Defendant") stands charged in a four-count indictment of: (1) possession with intent to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); (2) possession with intent to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) possession of firearms and ammunition during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i); and (4) unlawful possession of firearms and ammunition after a felony conviction in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). (Doc. 8).

      Pending before the Court is Defendant's motion made pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress all evidence seized from his person following his warrantless arrest on December 6, 2023, including all evidence obtained derivatively as fruits of the allegedly illegal search and seizure. (Doc. 21, "Def. Br.").[1] The Government opposed the motion to suppress (Doc. 22, "Opp."), and Defendant filed reply papers (Doc. 23, "Reply"). The Court heard oral argument from the parties on October 16, 2024. Defendant argues that the police violated his Fourth Amendment rights when they forcibly searched and seized him on December 6, 2023. His motion seeks to suppress evidence recovered during the search—a bag of

---

[1] Defendant also submitted with his motion an Affidavit from Defendant (Doc. 21-3, "Def. Aff.") and three exhibits, including body camera footage marked as Exhibit C ("Bodycam").

approximately 400 grams of powdered cocaine found on his person—as well as his post-arrest statements to the police and the contraband found in his apartment pursuant to a search warrant obtained after the arrest. Defendant also requested an evidentiary hearing on his motion. The Government argues that a hearing is not necessary.

For the reasons set forth below, Defendant's motion is DENIED.

## BACKGROUND

I. The Investigation

A Confidential Informant ("CI"), in late November 2023, told members of the New York State Police ("NYSP") that an individual named "Mike" was selling a ghost gun in the City of Poughkeepsie. (Def. Br., Ex. A, "DiPasquale Aff." ¶ 7). On December 2, 2023, the CI provided photographs of the gun and a phone number for Mike. (*Id*. ¶ 8). The next day, the NYSP attempted to conduct an undercover purchase of the gun from Mike. (*Id*. ¶ 9). When Mike did not answer the CI's call, the CI called someone he identified only as "Light" and asked if he had spoken to Mike. (*Id*.). "Light" said, "I just seen him and copped that." (*Id*.). "Light's" response, in sum and substance, was that he had just purchased the gun from Mike but that the CI could purchase another firearm from Mike. (Doc. 1, "Compl." ¶ 11).

On December 5, 2023, the CI contacted Investigator DiPasquale and advised that "Light" was planning to make a trip from Poughkeepsie to New York City to pick up a "resupply of narcotics." (DiPasquale Aff. ¶ 10; Compl. ¶ 12). The CI specified that "Light" would be traveling in a red 2013 Dodge Durango bearing New York Registration JCV3959 (the "Durango"). (DiPasquale Aff. ¶ 11). The next day, Investigator DiPasquale notified Investigator Michael Moore of the Troop K Community Stabilization unit that "Light" may be making a trip to New York City in the Durango. (*Id*.). Investigator Moore listed the Durango on a "Hotlist."

(*Id*.). Trooper Dale Beckmann of Troop K recorded in the police report that on December 6, 2023, he "received information from SIU-Hudson Valley that [the Durango] was making a trip to New York City to possibly purchase narcotics" and that "information obtained revealed that the unknown male is known to carry a firearm." (Def. Br., Ex. B, "Beckmann Report" at 5).

At approximately 1:29 p.m. on December 6, 2023, a License Plate Reader identified the Durango driving southbound on the Taconic State Parkway in Westchester County, New York. (DiPasquale Aff. ¶ 11; Compl. ¶ 13(a)). Thereafter, at approximately 3:27 p.m., the CI informed Investigator DiPasquale, in sum and substance, that the CI had spoken to "Light" and that "Light" was traveling from the New York City area back to the Poughkeepsie area. (DiPasquale Aff. ¶ 11; Compl. ¶ 13(b)).

II. The Stop

At approximately 5:10 p.m. on December 6, 2023, Troopers Dale Beckmann and Sean Rohde observed the Durango heading north on the Taconic State Parkway in the vicinity of the Town of East Fishkill. (Compl. ¶ 13(c)). Trooper Beckmann initiated a traffic stop after observing that the Durango (i) had dark tinted windows and an obscured front license plate; (ii) failed to maintain its lane; and (iii) "accelerat[ed] while the driver had the brake pedal pressed." (*Id*.; Beckmann Report at 5; DiPasquale Aff. ¶ 11). The driver of the Durango identified herself as Stacy Paulin and the sole passenger of the Durango, later identified as the Defendant, identified himself as Niheeme. (Compl. ¶ 13(c); Beckmann Report at 6). Stacy complied with the Troopers' directives, stated that she was driving to Poughkeepsie after about four hours in New York City, and identified Defendant as her brother. (Compl. ¶ 13(d); Beckmann Report at 6; Bodycam at 17:12:40-17:12:45). Trooper Beckmann reported that Stacy appeared nervous and was unable to state why she went to New York City. (Beckmann Report at 6).

3

Trooper Beckmann then interviewed Defendant while Defendant was seated in the front passenger seat. (Compl. ¶ 13(e); Beckmann Report at 6). During that conversation, Defendant stated, *inter alia*, that (i) he was traveling to Poughkeepsie from the Bronx (after initially stating that he was coming from Manhattan and then immediately correcting himself); (ii) Stacy was his girlfriend; and (iii) they spent approximately six hours in the Bronx. (*Id.*; Bodycam at 17:13:30-17:16:35). Trooper Beckman reported that Defendant failed to make eye contact and spoke in a low voice during that conversation. (*Id.*).

Upon receiving Stacy's consent to search the car, Trooper Beckman instructed Defendant to exit the vehicle for further interview and informed Defendant that he was not under arrest. (Compl. ¶ 13(f); Beckmann Report at 6; Bodycam at 17:18:40-17:19:05). Defendant, who was wearing a bulky, waist-length jacket, got out of the car. (Bodycam at 17:19:00-17:19:10). Trooper Beckmann informed him that he was going to pat him down and asked whether he had any weapons. (*Id.*). Defendant turned around to face the car, lifted his jacket above his stomach, and raised his hands in the air, which Trooper Beckmann stated was not necessary. (*Id.* at 17:19:10-17:19:18). Trooper Beckman described in his report that Defendant was making furtive movements such as positioning his body away from the Trooper, placing his hand inside his pocket, and acting nervous. (Compl. ¶ 13(f); Beckmann Report at 6). Trooper Beckmann proceeded to conduct a pat down, starting with the backside of Defendant's body. (Bodycam at 17:19:18-17:19:27). The pat down briefly ceased while Trooper Beckmann spoke to Defendant and then continued less than a minute later, resuming on the front side of Defendant's body.[2] (*Id.* at 17:19:50-17:20:05). Trooper Beckmann observed something in Defendant's jacket, asked

---

[2] The video evidence makes clear that the pat down paused for approximately thirty seconds before resuming. (Bodycam at 17:19:27-17:20:05). The parties dispute whether Defendant's actions in angling his body away from the Trooper or Trooper Beckmann's actions in walking away caused the "break" in the pat down. (Opp. at 13; Reply at 8). However, the question of who exactly caused the "break" in the pat down is not material to the Court's analysis of probable cause, discussed *infra*.

4

what it was, and Defendant responded that it was a "package for my brother." (*Id*.; Beckmann Report at 6; Def. Aff. ¶¶ 9-11). Trooper Beckmann then felt "a large bulky item" in Defendant's front left jacket pocket. (*Id*.). Trooper Beckmann directed Defendant to put his hands behind his back and attempted to handcuff him, but Defendant tried to flee on foot. (Bodycam at 17:20:05-17:20:50). NYSP officers at the scene took Defendant down and handcuffed him. (*Id*.).

While handcuffed and on the ground, Trooper Beckmann reached into Defendant's jacket and removed a clear plastic bag containing a white chunky substance from his front left interior jacket pocket. (*Id*. at 17:20:50-17:21:10; Def. Aff. ¶¶ 10-12; Compl. ¶ 13(f)). Defendant and Stacy were arrested and taken to NYSP headquarters in Poughkeepsie. (Compl. ¶ 13(g)). The substance recovered from Defendant's jacket pocket was tested and determined to be 408.8 grams of powdered cocaine. (*Id*. ¶ 15(a)).

III. Post-Arrest Statements and Apartment Search

At NYSP headquarters, after being read his *Miranda* rights and waiving those rights, Defendant told Investigator DiPasquale that the cocaine recovered from his jacket belonged to him, that he had recently purchased a firearm in Poughkeepsie, and that the firearm and other narcotics were in his apartment. (DiPasquale Aff. ¶ 12; Compl. ¶ 13(h)). On December 7, 2023, a search warrant was issued for Defendant's apartment. Law enforcement executed the warrant and recovered, *inter alia*, firearms, ammunition, and narcotics. (DiPasquale Aff. ¶ 15; Compl. ¶ 14).

## ANALYSIS

I. <u>Probable Cause for the Search and Seizure</u>

"On a suppression motion, the defendant has the initial burden of establishing a basis for his motion, and, if he does so, then the burden shifts to the Government to demonstrate, by a preponderance of the evidence, that the police acted lawfully." *United States v. Goulbourne*, No. 23-CR-00544, 2024 WL 4025997, at *4 (S.D.N.Y. Sept. 3, 2024).

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. As that "text makes clear, the concept of reasonableness is the touchstone of constitutionality of a governmental search. What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *MacWade v. Kelly*, 460 F.3d 260, 267-68 (2d Cir. 2006).

Defendant does not take issue with the stop of the vehicle or the initial pat down. According to Defendant, the illegal seizure and search began when Trooper Beckmann touched the top left part of Defendant's coat and felt the "large, bulky item." (Def. Br. at 6). Defendant contends that Trooper Beckmann "did not have probable cause to forcibly seize and search Mr. Anderson when he simply felt a 'large, bulky item' in Mr. Anderson's zipped front left jacket pocket while conducting a *Terry* frisk," and that the "subsequent warrantless search and seizure violated [his] Fourth Amendment rights." (*Id*. at 8 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). The Government responds that law enforcement "had probable cause to search the defendant before the Durango was stopped, and certainly after [Defendant] tried to flee from law enforcement during a pat down." (Opp. at 22).

6

"Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). A court's assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone. *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009)). *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

Considering the totality of the circumstances, the Court finds that Trooper Beckmann had probable cause to search and arrest Defendant.[3] At the time of the stop, Trooper Beckmann was aware that the Durango was making a trip to New York City to possibly purchase narcotics and that the "unknown male" was known to carry a firearm. (Beckmann Report at 5). Moreover, at the time of the stop, it is undisputed that: (i) the CI informed law enforcement that an individual identified as "Light" had recently purchased a firearm (Compl. ¶ 11); (ii) the CI informed law

---

[3] Defendant relies primarily on *Minnesota v. Dickerson* in support of his argument that Trooper Beckmann exceeded the permissible bounds of *Terry* when he handcuffed and forcibly searched Defendant. (Def. Br. at 9-10, 21 (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). *Dickerson* "prohibits an officer's 'continued exploration' for nonthreatening contraband during a protective stop 'after having concluded' that there was no weapon present." *United States v. Barnes*, No. 23-6385-CR, 2024 WL 4368274, at *2 (2d Cir. Oct. 2, 2024) (citing *Dickerson*, 508 U.S. at 378). Here, *Dickerson* is inapplicable because this was not merely a "protective search—permitted without a warrant and on the basis of reasonable suspicion less than probable cause." *Dickerson*, 508 U.S. at 366. As discussed *infra*, law enforcement had probable cause to search and arrest Defendant and, therefore, Trooper Beckmann's search was not constrained by the bounds of *Terry*.

7

enforcement that "Light" was planning to make a trip in the Durango from Poughkeepsie to New York City on December 6, 2023 to pick up a "resupply of narcotics" (DiPasquale Aff. ¶¶ 10-11; Compl. ¶ 12); (iii) the Durango was placed on the Hotlist (DiPasquale Aff. ¶11); and (iv) at approximately 1:29 p.m. on December 6, 2023, a License Plate Reader identified the Durango driving southbound toward the New York City area (DiPasquale Aff. ¶ 11; Compl. ¶ 13(a)). Such information is properly imputed to Trooper Beckmann pursuant to the collective knowledge doctrine. *See United States v. Long*, 678 F. App'x 31, 33-34 (2d Cir. 2017).[4]

Investigator DiPasquale believes the CI to be reliable because the CI had been utilized in multiple NYSP investigations in the past and was supervised "as closely as possible" during this investigation. (DiPasquale Aff. ¶ 6). Also, the CI has been assisting the NYSP in connection with this and several other investigations in exchange for leniency for pending criminal charges concerning theft and provided information in the past that had been independently corroborated and proven reliable. (Compl. ¶ 9, n.1). Moreover, the CI's specific information was corroborated by Defendant's presence in that exact vehicle, on the precise day, and traveling between the two specific locations identified. Accordingly, the information obtained from the CI supports a finding of probable cause. *See United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004) ("In addition to considering an informant's veracity, reliability, and basis of knowledge, in assessing the totality of the circumstances we also evaluate whether the information an informant provides is corroborated by independent police investigation because an informant who is right about some facts is more likely to be right about others.").

---

[4] Also, at approximately 3:27 p.m. on December 6, 2023, the CI informed law enforcement that "Light" was in fact traveling from the New York City area to the Poughkeepsie area. (DiPasquale Aff. ¶ 11; Compl. ¶ 13(b)). Defendant argues that this 3:27 p.m. call cannot be imputed to Trooper Beckmann because there is no evidence in the record that Investigator DiPasquale communicated the call to other officers. (Reply at 12 (citing *United States v. Hussain*, 835 F.3d 307, 316 (2d Cir. 2016)). The Court need not and does not opine on whether the 3:27 p.m. call is imputed to Trooper Beckmann given the other circumstances described *supra*.

The circumstances of the stop further support the existence of probable cause. While no physical description was provided of the male individual identified as "Light," Defendant was the only male present in the Durango on that day. Upon being interviewed, Stacy and Defendant gave conflicting answers about their relationship to one another (Bodycam at 17:12:40-17:12:45, 17:13:30-17:16:35). Also, while the parties contest whether Defendant made "furtive" movements (Opp. at 12, 25; Reply at 7-8), the video evidence is clear that Defendant stood with his body slightly angled away from Trooper Beckmann. (Bodycam at 17:19:16-17:19:50). Taken together with the information from the investigation, these circumstances may lead a person of reasonable caution to believe that Defendant was the individual identified by the CI as "Light" and who was engaged in illegal narcotics activity. *See United States v. Williams*, 803 F. App'x 473, 476 (2d Cir. 2020) (finding probable cause existed to arrest the defendant where he was only vaguely described but other circumstances—including his presence in a specific building, use of a car with a Pennsylvania license plate, and subsequent flight from pursuing agents—justified a person of reasonable caution in believing that he was the person who sold drugs in the transaction at issue); s*ee also United States v. Landaverde*, No. 10-CR-00531, 2020 WL 93890, at *3 (E.D.N.Y. Jan. 8, 2020) ("Factors such as furtive or suspicious behavior [and] inconsistent answers to law enforcement's questions . . . can form the basis for probable cause." (citing *United States v. Jackson*, 652 F.2d 244, 251-52, 251 n.6 (2d Cir. 1981))). Accordingly, at this point, probable cause existed to search Defendant during the stop and to arrest Defendant if contraband was found.

It is further undisputed that when Trooper Beckmann felt a large, bulky item in Defendant's jacket and attempted to handcuff him, Defendant attempted to flee on foot. (Beckmann Report at 6; Bodycam at 17:19:50-17:20:50). Here, there can be no dispute that

Defendant's attempt to flee supports a finding of probable cause to arrest Defendant. *See United States v. Babilonia*, 854 F.3d 163, 179 (2d Cir. 2017) ("We have long recognized flight as an appropriate factor supporting a finding of probable cause to search a vehicle after it is stopped."); *United States v. Martinez-Gonzalez*, 686 F.2d 93, 102 (2d Cir. 1982) ("[P]robable cause to arrest Martinez arose as soon as he fled from the approaching agents.").

In sum, given the totality of the circumstances, the Court finds that there was probable cause to search and to arrest Defendant. *See United States v. Steppello*, 664 F.3d 359, 366 (2d Cir. 2011). There is therefore no basis to suppress the cocaine discovered on Defendant's person or the fruits of that search.

II. <u>Evidentiary Hearing</u>

"[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Cantoni*, No. 19-4358-CR, 2022 WL 211211, at *3 (2d Cir. Jan. 25, 2022) (quoting *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (alteration in original)). "[A] defendant bears the initial burden of establishing, by an affidavit of someone with personal knowledge of the underlying facts, that there are, in fact, disputed issues of material facts." *United States v. Zayas*, No. 22-CR-00178, 2022 WL 16737223, at *3 (S.D.N.Y. Nov. 7, 2022) (citing *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989)). Here, the entire stop was recorded, and Defendant's affidavit does not contradict any material facts about what occurred during the stop. (*See* Def. Aff.). Indeed, the crux of the motion is not a dispute as to the facts, but whether those facts supplied probable cause for the search and arrest of Defendant.

Still, Defendant maintains that an evidentiary hearing is needed to determine: (i) the reliability of the tip from the CI; (ii) what police actions are authorized when a car is placed on a "Hotlist"; (iii) what facts where in Trooper Beckmann's possession when he made the stop and the source of those facts; and (iv) *why* Trooper Beckmann took the challenged actions. (Reply at 3-9) (emphasis in original). The Court disagrees. None of these issues constitute specific, factual issues that are necessary for the Court to determine whether probable cause existed. As discussed *supra*, the Court found the CI's information sufficiently corroborated and reliable, and the record is clear as to what knowledge was imputed to Trooper Beckmann and what occurred during the stop. Trooper Beckmann's testimony regarding what he thought the bulky item to be is not necessary to determine probable cause under the circumstances of this case. Accordingly, an evidentiary hearing is unnecessary because of the absence of any "contested issues of fact that must be resolved in order for this Court to rule on [the] motion to suppress." *United States v. Holt*, No. 21-CR-00080, 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021); *see also United States v. Merced*, No. 19-CR-00832, 2021 WL 5647827, at *11 (S.D.N.Y. Nov. 30, 2021).[5]

## **CONCLUSION**

The motion to suppress is DENIED. The conference scheduled for December 5, 2024 at 10:00 a.m. in the White Plains courthouse will proceed as a status conference.

The Clerk of Court is respectfully directed to terminate the motion sequence pending at Doc. 21).

**SO ORDERED.**

---

[5] *See also United States v. Caming*, 968 F.2d 232, 236 (2d Cir. 1992) (holding that the district court was not required to hold an evidentiary hearing before denying a motion to suppress where the defendant's affidavit did not create a dispute over any material facts and where the factual issues the defense contended necessitated a hearing were irrelevant to the inquiry before the court), *abrogated on other grounds by Peck v. United States*, 73 F.3d 1220 (2d Cir. 1995).

Dated: White Plains, New York
      October 17, 2024

                                                     _____
                                                     Philip M. Halpern
                                                     United States District Judge